## LEWIS *v.* SHORTER

No. 39718        November 7, 1955        83 So. 2d 79

*Lyon, Davis & Price,* Indianola, for appellants.

*Satterfield, Shell, Williams & Buford,* Jackson; *James B. Sykes,* Mendenhall, for appellee.

Lee, J.

J. W. Shorter, by his bill of complaint, as amended, sought to require Mrs. Mary Catherine Upchurch Lewis and husband, Lester G. Lewis, and the Peoples Bank at Mendenhall, Mississippi, to return and deliver up to him a certain warranty deed by the Lewises to him, which conveyed 340 acres of land in Simpson County, as described therein, or execute a duplicate thereof, or, upon failure to do either, that a commissioner be appointed to make and deliver a proper deed to him. After the various pleadings were settled, the sole remaining issue was whether or not the consideration for the deed was paid and the deed delivered prior to the attempt of the grantors to stop delivery. At the conclusion of the trial the court found for the complainant, and entered a decree awarding the relief as prayed for. From that decree, the Lewises appeal.

Mrs. Lewis, in whom the title to this land was vested, through the negotiations of her husband, leased it to Shorter for pasture purposes on March 29, 1948, for one year; and he continued in possession thereafter. Lester G. Lewis, her husband, wrote Shorter on July 12, 1953, from Troutlake, Washington, that he had decided to offer the property for sale, and inquired if Shorter wished to make an offer. On July 20 Shorter acknowledged receipt of Lewis' letter, thanking him for a chance to buy, and asked for his price. On July 22, Lewis acknowledged receipt of Shorter's letter and informed him that "Our asking price for 340 acres is $12.50 per acre, taxes prorated, with 1-2 down and balance on terms if desired". Upon receipt of this letter, Shorter went to the Peoples Bank at Mendenhall and got a commitment from the president of the bank to make him a loan of

$4,250 to pay for this land. About this time, W. I. Up-church, father of Mrs. Lewis, went from his home at Morehead, Mississippi, to see Shorter about the sale. Shorter informed him that he was going to accept the Lewises terms and was going to write them to send the deed to the bank and asked Upchurch to let them know also. On August 1, Lewis wrote Shorter that he had received a letter from W. I. Upchurch, advising that Shorter wanted the deed sent to the bank, and asked for information together with directions about the deed. On the same date, August 1, Shorter answered Lewis' letter of July 22, informed him that he had made arrangements to pay all of the money, $4,250, and directed him to send the deed to the Peoples Bank at Mendenhall for collection, and informed him that the bank would remit the money by return mail. This letter obviously crossed Lewis' letter of the same date in the mail. At any rate on August 6 Howard Q. Davis, an attorney, wrote Mrs. Lewis in the State of Washington that, at the request of her father, W. I. Upchurch, he was enclosing a deed for execution by her and her husband to Shorter, and suggested the drawing of a draft on Shorter, together with other suggestions. He sent a carbon copy of this letter to Shorter.

After Shorter had accepted the proposal and had received the copy of the letter from the attorney, he called at the bank several times to ascertain whether the papers had arrived. On August 13, the deed, executed by the Lewises, was forwarded to the Peoples Bank at Mendenhall by the Hood River Branch of the First National Bank of Portland, Oregon, with draft drawn on Shorter in the sum of $4,217.85, which, added to $4.95 and $27.20 for documentary and mineral stamps, respectively, aggregated $4,250, with instructions to deliver the deed to Shorter upon payment of the draft.

The Peoples Bank received these papers on August 17 and notified Shorter, who came in the next day, checked

the deed, and found it to be satisfactory. Both Shorter and Sidney D. Davis, President and Cashier of the bank, testified that Shorter accepted the deed and wanted to sign and execute then the necessary papers to consummate the loan by which he was to realize, under the previous commitment from the bank, the $4,250 with which he was to pay for this land. Davis, the banker, testified that, after Shorter contacted him about the loan, and prior to the receipt of the deed, he checked with the bank's attorney, who was familiar with the general basic title of this land, and found that it was a good title. Except for the preparation of the note and deed of trust and the mere formality of the attorney in writing a certificate, the loan would have been fully closed that day, thus actually effecting the payment of the draft. Both Davis, for the bank, the lender, and Shorter, the borrower, considered that the money was then available to pay the draft. The balance of the transaction was mere routine; and so far as the deal was concerned, they treated it as if it had been closed. They both testified that Shorter gave the deed back to Davis in order that he might prepare the necessary papers to be signed by Shorter and his wife.

Shorter's version can be seen from the following answers: "When I got the price, I came straight down here and Mr. Davis * * * told me specifically that he would let me have the money to buy it." When Davis "handed the deed to me for inspection * * * I told him that it was O. K. with me and I accepted the deal. I gave him back the deed to finish the papers that he had to finish and left it in his care for that purpose. * * * he was to have all the papers fixed up ready for me and my wife to come and sign." He was "ready, willing and able to execute the necessary papers * * * And I accepted the deed as it was and gave it back to him * * * to hold for me to finish completing the loan." He did not have $4,250 in the bank, but "I had Mr. Davis' word that it was

good * * * If it had to be put there, Mr. Davis' word was good and he had promised to do that."

Certain answers of Sidney D. Davis, called as a witness by the defendants, were as follows: He made the commitment to Shorter for the loan about three weeks or a month previously. Q. "Had you in the meanwhile, prior to this date when the deed was delivered to Mr. Shorter and subsequent to his original contact with the bank, checked with your attorney, Mr. Sikes, as to whether or not he was familiar with the general basic title and you found it was a good title? A. Yes, sir." While, on August 18, when Shorter accepted the deed, he did not actually give the bank $4,250, "I confirmed to him a prior agreement we made with Mr. Shorter before he bought the land * * * Mr. Shorter wanted to prepare his papers the day he came to see the deed. He was ready to execute the instrument to us at that time." He did not have sufficient money in the bank in his own name to take care of it, "but he had my commitment * * * Q. I believe you stated a while ago in response to the question of counsel that as president and cashier of the bank that you considered that with the commital of the bank to Mr. Shorter that payment had been made to the bank of $4,250.00 with the deed being held as security so that the formalities might be completed. Is that correct? You considered that actually $4,250.00 was available in the bank? A. Yes, sir. * * * Q. Other than the ministerial duty of executing the mortgage, which he had already agreed to execute and which you had agreed to accept, you considered it as a final transaction? A. Yes, sir"; and he so advised Attorney Davis and Mr. Lewis when they called over the telephone to stop the deal. His words to Davis over the telephone were, "I told you over the phone—that the transaction had gone too far and that Mr. Shorter was ready and able to pay and that I had obligated the bank to make the loan and that for all practical purposes it was a closed deal." It is true that several other answers of this witness, if isolated or taken

out of context, in themselves alone, could be deemed conflicting; and, if believed, would warrant a different conclusion.

Here was the bug under the chip: Sometime in the afternoon of August 18, W. E. Bridges offered Shorter $7,500 for the timber. His offer not being accepted, Bridges called the Lewises over the telephone the next day and offered them $7,500 for the timber. On the 20th, Howard Q. Davis, the attorney, called Davis, the banker, over the telephone and ordered him to return the draft and deed. This telephone call was confirmed by letter. A wire was also received from Lewis. As has been seen, Banker Davis advised attorney Davis, in the telephone conversation just mentioned, that the transaction had gone too far; that Shorter was ready and able to pay; that he, Davis, had obligated the bank to make the loan; and that for all practical purposes it was a closed deal.

Shorter and wife executed the deed of trust on August 22, and tendered the money to the bank; and upon its failure to deliver up the deed to him, he filed his suit in the chancery court against both the bank and the Lewises and again tendered the amount of $4,250 into court.

██ ██ Now it is true that "Where a bank receives commercial paper for collection merely, the relationship which arises between the depositor and the bank is that of principal and agent. The agency thus created continues in the absence of a revocation * * *." 9 C.J.S., Banks and Banking, Section 218, pp. 466-7. ██ ██ And "Ordinarily a bank is the agent of its depositor with respect to collection of paper, but becomes his debtor after collection." 9 C.J.S., Banks and Banking, Section 280, p. 583. ██ ██ It is also true that "Unless the bank has a lien for past or present advances, the owner of paper which has been sent to the bank for collection has the right, at any time prior to collection, to revoke the bank's authority to collect, and to demand the return of the paper, and a refusal to comply with such a demand operates as a conversion." 9 C.J.S., Banks and Banking, Sec-

tion 217, p. 466. ■■ ■ Obviously no delivery of the deed occurred unless or until the fulfillment of the condition, that is, until the deed was accepted and the money paid. See 26 C. J. S., Deeds, Section 43d, p. 244; Mississippi State Highway Commission v. Anderson, 183 Miss. 458, 184 So. 450.

The case turns on the narrow question as to whether or not, under the evidence, there was in fact a payment of the money to the bank and a delivery of the deed to Shorter before notice to stop delivery.

■■ After the efforts of her husband and father had resulted in finding a potential buyer of the land, and after her attorney had prepared and sent to her a deed to consummate this sale and purchase, in exact conformity to the negotiations and representations of her husband, Mrs. Lewis, together with her husband, executed and acknowledged the deed to Shorter. She then entrusted it to her husband to deliver upon payment of the consideration, and he in turn attached it to a draft, drawn by him on Shorter and payable at the Peoples Bank, and deposited it with the bank in Oregon. That bank in turn forwarded the deed and draft through regular channels to the Peoples Bank, advising that "You are authorized to deliver to Mr. Shorter this warranty deed upon payment of the draft above mentioned." Obviously Mrs. Lewis and her forwarders had no right to stop delivery of the deed after payment of the draft. The bank, under its commitment to Shorter, considered that it had the money in hand to pay the draft. It refused to return the draft. Its president testified that he considered the deal to be closed on August 18, two days before the notices to stop delivery of the deed were received. Thus when the notices were received, the relation between the bank and Mrs. Lewis and her forwarders was that of debtor and creditor, because, under the agreement between Shorter and the bank, the bank had stepped into Shorter's shoes, and by its acts and conduct, had in effect received the money from Shorter with which to pay the draft, and

had made itself liable to Mrs. Lewis and her forwarders for the proceeds thereof.

It was the peculiar province of the chancellor, as the trier of the facts, to reconcile possible conflicts in the various statements of the witnesses and resolve and determine the facts. He found, from all of the evidence, that payment of the draft, the amount of the consideration for the deed, had been assured by the Peoples Bank and that there was a delivery of the deed on August 18, which was two days before the attempt to stop payment and delivery. The effect of this finding was that the bank, in lieu of requiring Shorter to deliver to it manually $4,250, substituted its commitment to him for the money and thereby paid the draft before notice to stop delivery was given. There was substantial evidence to sustain the finding, and we cannot say that the chancellor was manifestly wrong.

Wherefore it follows that the decree of the lower court should be, and is, affirmed.

Affirmed.

*Roberds, P. J.,* and *Hall, Holmes* and *Arrington,* JJ., Concur.

ETHRIDGE, J., dissenting.

In my opinion the judgment rendered in this case departs substantially from established legal principles with reference to the right of a drawer to revoke a draft sent to a bank for collection with deed attached. A deposit for collection is a transaction by which a draft or other instrument providing for the payment of money is deposited with a bank to act as agent of the depositor for its collection. The universal rule appears to be that the owner of paper which has been sent to a bank for collection has the right, at any time prior to collection, to revoke the bank's authority to collect, and to demand the return of the paper, and a refusal to comply with such a demand operates as a conversion. 9 C. J. S., Banks

and Banking, Section 217. The relation which arises between the depositor and the bank is that of principal and agent. The relation of debtor and creditor does not arise prior to the collection of the instrument deposited. Ibid., Section 218; Bank of Shaw v. Ransom, 112 Miss. 440, 73 So. 280 (1916); Marine Bank & Trust Company v. Triplett, 149 Miss. 274, 115 So. 202 (1928). These principles are well-established both in Mississippi and elsewhere. It is my view that the undisputed facts, as distinguished from the conclusions of witnesses, show that the authority of the Peoples Bank to collect was revoked by Mrs. Lewis prior to collection and delivery of the deed, and that there was no delivery.

The controlling opinion states that the question is whether in fact there was a payment by, and a delivery of the deed to Shorter before the bank's authority to collect was revoked by Mrs. Lewis. It answers this inquiry in the affirmative on the theory that the bank, under its commitment to Shorter, considered that it had the money in hand to pay the draft; that under the agreement between Shorter and the bank, the bank had stepped into Shorter's shoes, and had in effect received the money from Shorter with which to pay the draft; that the bank substituted its commitment to Shorter for payment by Shorter of the money, before notice to stop delivery was given; and that conflicts in the various statements of the witnesses were resolved by the trial court. However, the facts and what happened seem to be undisputed. With deference, the controlling opinion gives determinative effect to the conclusions of the witnesses Shorter and Davis, President of the Peoples Bank, and thus draws a conclusion of delivery prior to revocation.

The bank received the draft and deed from Mrs. Lewis, through the Portland bank, on August 17. The letter from the Portland bank to the Mendenhall bank expressly described the latter's agency: "You are authorized to deliver to Mr. Shorter this warranty deed upon payment of the draft above mentioned." Shorter testified that

he had previously "arranged" for the bank to lend him the money. He did not have it in his account. However, it is undisputed that when on August 18 he examined the deed and returned it to Mr. Davis, the bank president, he had not completed any arrangement for the loan and had not in fact received the loan. Shorter said that Davis handed him the deed "for inspection", and that he advised Davis it was all right and "gave him back the deed to finish the papers that he had to finish and left it in his care for that purpose." He admitted that Davis was then to have all of the papers "fixed up ready for me and my wife to come and sign." The Shorters were to execute a note and deed of trust for the amount of the loan to Shorter from the bank, and the bank also was to obtain a title certificate from its attorney. Before Shorter had completed the necessary details for the loan, Mrs. Lewis, through her representatives, revoked on August 20 the bank's authority to collect the draft and deliver the deed. The present suit was filed by Shorter on August 22, two days thereafter. Shorter testified that he closed the loan and obtained the $4,225 from the bank on August 22, two days after Mrs. Lewis had revoked the bank's authority. This fact is undisputed in this record. On cross-examination Shorter stated that on August 18 he gave the deed back to Davis "to hold for me to finish completing the loan". He was relying on Davis' commitment. But of course Mrs. Lewis was not relying on Davis' commitment to Shorter. There is no showing that she knew anything about this particular commitment.

Shorter said that his loan with the bank was actually closed and completed on August 22, and that up to that time he did not actually have the money to apply on the deed, except "Mr. Davis' word". After appellant had revoked the bank's authority, Davis refused to deliver the deed to Shorter. Shorter was asked, "Why did you borrow this money from the Peoples Bank on August 22?" He answered, "To take care of what hadn't been finished." He therefore admitted that he had not finished

the necessary preliminaries to a loan from the bank on August 20 when appellant revoked the bank's authority to deliver.

The only other witness whose testimony is pertinent to the issues in this case is Sidney D. Davis, President and Cashier of the Peoples Bank in Mendenhall. He stated that if a sight draft is forwarded to his bank for collection, "We remit when we have received authority either to charge the account or receive cash." Of course neither of these contingencies had occurred when appellant revoked the bank's authority. Davis testified that when he saw Shorter on August 18 Shorter did not actually pay the bank any cash money, but that he confirmed a prior agreement that the bank had made with Shorter to lend him the money. Davis was not willing to advance the money until the note and deed of trust were executed, and the bank obtained an attorney's title certificate. He said, "It is not customary to advance money until then." He testified that Shorter did not have sufficient deposits in the bank on August 18 to pay the draft, and that at the time appellant revoked the bank's authority "no cash money had been delivered" to the bank by Shorter. Davis' own conclusion as a banker was that for all practical purposes "it was a closed deal" when Shorter told him on the 18th that he would accept the deed as written and would complete a loan from the bank. But of course that was only his conclusion and was not a statement of fact.

Davis was asked, "When was the money actually loaned to Mr. Shorter?" He replied, "On August 22, 1953", which was two days after appellant had revoked the bank's authority to deliver the deed. Finally, Davis testified as follows: "Q. What was your intention when you handed the deed to Mr. Shorter? Did you intend for him to take the deed and record it? . . . Q. What was your intent as you handed him the deed? A. My intent was to let him examine that deed and see if it was in order and see if that was the land he had bought. Q. To

examine the deed? A. To see if that was the land he had bought. He said, 'That is it. It is O. K. As far as I am concerned, I am ready to complete the execution of the deed of trust to the bank and wind the transaction up.' Q. You did not consider the transaction closed and that he could then take the deed and record it from that moment on, did you? A. No, sir." So by Davis' own admission, he naturally had no intention of letting Shorter have the deed until he had signed the note and deed of trust to the bank, and certainly had no intention or purpose of delivering it to Shorter on August 18, until those necessary business details were consummated. It is a matter of common practice and experience among members of the bar and businessmen that the money representing a loan from a bank to a borrower is not advanced until the borrower has executed a promissory note and the necessary deed of trust or other collateral to secure it and until the title has been cleared to date. The president of the Mendenhall bank admitted that was his practice and that he had no intention to deliver the deed to Shorter on August 18, until the papers for the loan were executed. Yet the effect of the controlling opinion is to hold that the execution of the note and deed of trust, and the obtaining of a title certificate were mere incidental details, the absence of which did not preclude delivery of the deed on August 18. It seems to me that the holding is contrary to the undisputed facts in this case, to accepted and sound business practices, and to established rules of law.

The majority opinion holds that the bank had substituted its commitment to Shorter for the cash money, and had thereby paid the draft before revocation of authority. However, I can find no evidence to support the conclusion that the bank had in fact substituted its commitment to Shorter for payment by Shorter of the draft in cash. Certainly Mrs. Lewis had no intention of any such substitution, and more importantly, the bank clearly had no authority and no intention to make such

a substitution. If on August 20 Shorter had refused to sign the loan papers, the bank without a doubt would have considered that the draft was not paid, and in fact it would not have been paid. Unquestionably, if the bank's title certificate on August 20 had reflected a defective title, the bank would not have made the loan to Shorter, and it would not have paid the draft. The result reached by our judgment here seems to me to be wholly unwarranted by the undisputed facts, and established business customs and rules of law.

In 9 C. J. S., Banks and Banking, Section 243, is a discussion of "what may be accepted in payment." The general rule is that a bank having paper for collection is negligent in receiving in payment therefor anything but money, unless a special authority to do otherwise is shown. There was no such special authority here. The same text states the basic rule as follows: "The collecting bank may accept in payment, if it is solvent, a check drawn on itself and based on a sufficient deposit, or its own certificate of deposit; but it cannot accept, in lieu of money a note or other claim against itself, which the debtor may have, no matter how valid the claim." Montreal Bank v. Ingerson, 105 Iowa 349, 75 N. W. 351 (1898). Here there was no equivalent of paying the draft or crediting its amount to the drawer, Mrs. Lewis. Davis, the bank president, does not contend that any such credit was made or attempted to be made.

The controlling opinion suggests that the bank's commitment to Shorter was substituted for Shorter paying the money. But of course there was no valid substitution as to the drawer, Mrs. Lewis. The bank's limited agency for collection and delivery of the deed contemplated no such unusual departure from standard business practice. The basic rule is stated in 26 C. J. S., Deeds, Section 43 d, p. 244: "Where a deed is given to a third person to hold until the performance of some act by the grantee or the happening of some contingency, it does not operate as a delivery to the grantee, until the performance

of such condition, and a delivery by the depositary contrary to the directions of the grantor will not pass the title.'' So if there were an attempted delivery of the deed, and all of the testimony indicates there was not, still a delivery by the bank contrary to the directions of Mrs. Lewis would not pass the title. The trial court's opinion was based upon the mistaken idea that the deed was placed in the Peoples Bank under an irrevocable escrow contract. But this position is untenable, because Mrs. Lewis never signed any contract to sell this land, or any escrow agreement. Nor is there any showing that there was an intention to create an irrevocable escrow agreement. 30 C. J. S., Escrows, Section 5. The majority opinion does not mention that theory.

So my view is that on the undisputed facts, as distinguished from the witnesses' conclusions, there was no payment of the draft and delivery of the deed prior to revocation of the bank's authority to deliver it. Mrs. Lewis had the power at any time prior to collection to revoke the bank's authority, and under the testimony of both Shorter and Davis this was done. Hence I would reverse the decree of the trial court and render judgment for appellant.

*Kyle* and *Gillespie, JJ.*, join in this dissent.